Good afternoon and welcome to Brain Strainer. We are here for the case of Dr. Seal v. Sessions. The time available is on the clock. If you want to reserve some time for rebuttal, please watch the clock and let us know. If we have any questions about classified information, we will discuss this when we return to conference. If you would like to ask the attorneys to remain for a few minutes after we adjourn and end the panel. Good afternoon, your honors, and may it please the court. My name is Andrew Crocker. I'm with the McClellan-Curnoff Solid Council Table. And we represent the two National Security Letter recipients in this case, identified as preliminary in the evidence filing as CREA Mobile and POTS Letter. We are going to ask you as a preliminary matter whether this entire case now is clear, or whether there's anything left. Since what was being argued about was that the recipients never disclosed their identity and that they had received this, I'm concerned as to how it seems like that information is now disclosed. No, your honor. The case is not moved. This concerns five individuals, and that is the government's file of unlawful disappearance. As to two of those, the gag orders remain in place. Which two are you saying? The 1-2 Cloudflare, the Philadelphia, the one that was issued to the Philadelphia office, and the PL-16160-2? So, one of the MSLs issued to Cloudflare remains in place as the government's file. Oh, that's what's in my hand. Go ahead. I think you can answer quite sure which one. I believe that I'm not allowed to reveal which of the two MSLs in a public hearing. So, the fact that you received two MSLs is now disclosable, correct? That's correct, your honor. The FBI determined six years and four years respectively after the institution of this case that changed before the argument. It could now license and create an exception to this with a blanket gag order and allow Cloudflare to state that it received two MSLs. Nevertheless, Cloudflare is restrained from revealing any other information about the MSL. It can, of course, reveal information about the subscriber of MSLs it's information about. It also can't state what sort of information the FBI sought, whether Cloudflare complied with that request, and, you know, other statistical information next to MSL. Again, we start right back at the same place. And so, I don't think any sort of opinion is correct, or in this case, reveals that my client sought to engage in political speech about MSLs directly to Congress and the public, and they were prevented from doing so by these MSL gags, which I think still remain in place here. The other one, as to Credo, remains in place as to the customer of Credo, about whom the FBI sought information. And that's now a permanent gag order because the FBI, issuing that letter that it's going to start filing, has now made its final determination upon the close of the investigation that alleged this MSL. And under curfew procedures adopted by the FBI in pursuance of the U.S. Immigrant Freedom Act, that is the last thing they have to do. No court wants to look at it, and it will remain in place forever. And so, what you're not being allowed to disclose is the customer account and subscriber information, is that it? Yes. Or is there more information that you can't disclose? As to the Credo, MSL, that's correct. As I said, the Cloudflare MSL is fully in place, and all of the information I listed is still restrained to the U.S. Immigrant Freedom Act. Thank you for answering those questions. They were also on one of my comments. I said you got to do such a fine job of getting the answer to that. So I think the evidence filing on Monday is a perfect illustration of the FBI's unbridled discretion in administering such a crass deception. It's an extraordinary power that voter law allows the FBI to put request records from communications providers like my clients and then prevent them from speaking about these requests in advance without the sort of mandatory court oversight in a finite time when it's required under the First Amendment. Indeed, MSL connects violating the First Amendment as well as the unconstitutional driver's rights to use these content restrictions on speech. And the incremental changes passed by Congress in the U.S. Immigrant Freedom Act are seriously enough to remedy these fundamental flaws in the statute. Well, it seems to me that you have pretty well-taken-at-least arguments as it relates to freedom of factors and strict scrutiny. The one part of this brief that was so worrying to me was your arguments from the Nebraska Press Association. Well, I mean, it seems to me from that case you say that the government has to show four things. Right? Sir, what did you say? You say that the government has to show four things. The harm to the government interest is highly likely to occur. The harm will be irreparable. The only alternative exists for preventing the harm. And the prior restraint will actually prevent the harm. That's correct, Your Honor. It's not just the Nebraska Press case. The decisions of this Court, the Levy case in particular, made clear that that is the test for upholding a prior restraint on substantive grounds. The District Court simply refused to apply that binding precedent because it concluded that this was not a so-called classic prior restraint, that recipients like my clients are not those who customarily wish to exercise rights of free expression. And that's legally unsupportable. And so it's a test. It's a test. It was applied to a district, and it's a test. Nebraska Press was also applied to a district screening, and we have a different way we apply, we use the words of the district screening test in different ways in different contexts. And in Nebraska Press, the actual meeting was both in the context of alleges of subpoena rights versus first amendment rights, which is what could be said about a trial conviction and other things. Why wouldn't we apply just other regular district screening, but there has to be, as the District Court did, there has to be a compelling purpose, which there's no dispute here that national security is a compelling purpose, and that the restriction has to be narrowly tailored. I mean, the actors, as you pluck out some language from those cases, sounds like nobody would ever ask that. The District Court has told us that. It's not a thing to look back. It's just straggling. Well, Your Honor, I take your point about the semantic slippage between district screening and prior restraint screening, but we're stuck together. So I try not to use a staged analysis. Prior restraint is a restriction on speech in advance, and it implicates the Nebraska Press actors and all of the sort of things the court needs to look at in that case, where district scrutiny has been a content-based restriction on speech, and they may come from different places. I think the actors from the Nebraska Press case and the Levine case apply to prior restraint, because the Supreme Court has said that prior restraints are the sort of most serious and least tolerable use of force. My understanding that you're saying that the treatment of actors is not the test we use for prior restraints, but something more stringent. Is that your argument? It's both. They go to certain analyses, Your Honor. The three main factors go to the procedural protections for prior restraints, whether the government bears the burden of justifying a prior restraint at every stage of the proceeding, whereas the Nebraska Press test and the New York Times case and the Levine case all go to the substantive factors that go into upholding a prior restraint, which, as you say, is very difficult to do, but it's not a fatal in fact, and has been upheld in certain cases. Because the prior restraint cases seem to say that if you meet these standards, then a prior restraint is permissible. So I guess I would say we haven't seen a case where the court said, first, you have to prove to your certainty that her will resolve the plan. It's irreparable. No alternatives exist. And then you have to say that you meet these procedural standards. I haven't seen any case like that. I think that's because they usually emerge in different scenarios, Your Honor. So the three main factors often emerge in a government licensing scheme where the court is not involved at all and the government therefore has to bear the burden of judicial review in all cases, which the substantive does not require. The substantive factors are quite important. But the three main factors are not applicable here, because we don't have a licensing scheme. No, Your Honor, the three main factors are very much applicable here in a state licensing scheme. What I'm just going to add to say is that once it comes before a court, the substantive standards that the court must apply are those that's from the Lebron case and the Brasket case. They're different inquiries, but they're both really located in this case. Well, if I were looking at your third, Your Honor, excuse me, the harm of being irreparable, I studied the Brasket case and other cases, and I guess the harm must be irreparable. I can only find with concurring justices the most plain opinion. Why should that be part of the Canoe State? I think it's inherent, Your Honor, in the consideration of the effectiveness of a prior restraint and whether it will actually permit the harm that the government seems to permit. If it's not going to be effective, and this is in the Brasket case and in the other cases as well, there's no reason to issue a prior restraint because it is such a large infringement of the First Amendment rights that it actually has to be necessary to prevent the harm. And I understand your argument, but I guess my worry has always been, and maybe I'm reflecting of what Judge Akut has always said, when I've approached these cases, I've said, well, if I'm going to approach them from the procedural basis, then you can free me of the factors. If I'm going to look at them from the regular basis or the merits, if you will, I would look at a stretch through to the analysis or whether we don't have stretch through. But even if we did have stretch through, I'd look at that analysis. And I never found a case that really approached this as you've suggested it be approached here. And so, therefore, it seemed to me that I was looking at where do they can do some analysis from. Your Honor, I don't think that your test you just laid out and your approach to analyzing prior restraints are actually incompatible with the approach that we've suggested in our briefs, that was the 5-K-5 approach. It seems to me that if I'm going to look at whether this is a procedural analysis, I look at the freement factors. And if I look at the merits analysis, I go straight to the stretch through to the analysis. If I adopt your approach, which if I go straight to the stretch through to the analysis, I'm not sure that these test that's now saying I should apply, apply. Or I don't know, are they applying? Well, you've done it a different way, Your Honor. I think the freement factors are the first thing the court has to recognize. It's procedural. It's procedural. But if I'm going to get through the freement factors and you apply the stretch through to the analysis, you've done all you need to do under the Brexit Act. So, again, I don't think that's incompatible with our arguments. Under the freement factors, one of the factors is for government to secure the burden of proof once it comes before the court. And then the question becomes, what is the showing the government has to make in how you support what standards does the court apply? It's evaluating that showing. And that is where the Brexit factors come in, the necessity that they order be narrowly drawn, that there not be speech-restrictive alternatives. I think that it's sort of encapsulated in the procedural requirements of freement in that way. And then there's a separate analysis because it's a content-based restriction on speech that requires narrow tailoring. Now, the analysis, literally these two separate doctrinal tests might be overlapping and over-perspective. So, for instance, the fact that the government doesn't have to issue an error or get an order when that might suffice goes both to the narrow tailoring analysis under 638 and its reconsideration of what speech restriction alternatives. So I think the court can reach the same outcome of applying either of those tests. Perhaps turning to the general, if I look at prior restraint, the government argues this really isn't a prior restraint. The district court felt like it really was a prior restraint. District court says the NIS health disclosure requirements are not a typical prior restraint. I guess I'm just trying to figure out what's best. It isn't exactly a prior restraint. I mean, the person doesn't even know they're going to get this restraint, if you will, until they get it. It is a prior restraint. It's an index restriction on speech. We post it voluntarily on the recipient. It just happens to occur at the time that the request is made, and that's what the recipient wants to speak about. Well, why is this in schemes? There are always situations where the person is intending to speak, they've got a cell, or they've got a book, or a newspaper article, and then the government swims in and says, you know, without our permission, or you can't do it at all. This is on all sorts of cases. You agree with that, right? The context is different, Your Honor, but I think that's the faulty premise that the district court began from. And some recipients are not customary speakers. That's wrong. It's a legal matter and a factual matter. I don't know that customary speakers matter. I mean, then there's the other set of cases that the government point story has pointed to, which is, well, when the government, when a person gets information through government activities in a court, or in a discovery, or whatever, confidentiality requirements can be improved. So they have to make an argument that it's not a prior history. And this does seem more like those cases. Two points, Your Honor. First, I don't think that those cases are analogous. These are involuntary restrictions on speech, and the cases involving contractual obligations, those who reveal information, or information received in discovery, subject to a protective order, are both voluntary types of agreements undertaken by a party seeking that information. I don't think there's been a grand jury, and the government argues that it's not particularly voluntary. And it's the same as well. On several grounds, Your Honor. First, the grand jury is the insurer, the secretary, the secrecy inherits from the insurer's proceeding against the district court. I just don't fully understand. Yeah. The secrecy here inherits from the insurer's executive investigation, so how does that relate? Well, it sort of relates to the second point I was going to make, Your Honor, which is that it's supervised by a court. Here, it's not supervised by a court. So to say that the secrecy is inherent in the proceeding, in its own context, is to entirely credit the government's arguments for secrecy, but not examining it at all. And that's what the prior restrictions were. Before, Dan, can you answer the court now, he was reviewing these, all of these, the government's reasons for issuing them. And the district court thought that those changes to the judicial review were sufficient. Your Honor, even under the revised statute, the sort of most significant change being that it refers to a case in case. Judicial review does not take place in all cases. It's actually the rare instance where an innocent recipient overcomes the burden being placed on them and stands up to them. And it's just telling the government they want judicial review? That's what the district court says. Not much of a burden. Well, Your Honor, how it works, my clarity can tell you, this is not as simple as picking up the phone, as the government would do, and it's not a de minimis burden. What does it have to do in order to trigger that 30-day requirement? Well, you have to notice how the government doesn't say it's an institutional intimidation and show all of their risks to a business interest. These are service providers who are engaged in a business. So they don't undertake the decision to stand up to the FBI. Like, they have an ongoing relationship with law enforcement and they, you know, say to the FBI, we actually don't agree with your decision here. It's actually a very momentous decision and it's a very sort of hurdle that the court in Freeman said was unconstitutional. When you, when a senator gets to impose a prior restraint without them having to justify that prior restraint, it will deter well speakers, which I think is the mistake that the district court made when it, when it said, we don't know that the recipients don't want to speak. The evidence is, is, because it's probably the other way. My clients have sought to engage in political speech, like many other companies in their industry. And it's the government that's offered no evidence for the idea that some recipients is the class don't want to speak. And the first amendment is never made in the decision. It's never confusion on who you are, what is the value of speech or whether the government can restrain that speech. I don't think that the distinction is supportable in the law. And I don't think it makes sense to create this difference. It's not that you can say, look, you submitted automatic judicial reviews that are required under Franklin. I believe you're quoting from the district court, your honor. Well, I look at Franklin. There's nothing in there that says automatic judicial reviews required. Respect to your honor, I believe what Franklin says is that the censor must either go to court in all cases, or the restriction on speech will dissolve automatically. The censor must have the burden of instituting the proceedings, which in fact, that's exactly right. All your client needs to do is not just the government and the government's got to go forward immediately. So it's given a maximum of 30 days. The status quo, your honor, is when the government issues an incident where there's no burden to go to court or have that incident dissolve after a specified brief period, which is the language used by the district court in Fremont. They get to play the odds. They get to issue these and then assume that penitentiary gets And then for your instance, as I said, where they undertake a burden and do a check, then the judicial review takes place. That's not the same as judicial review in all cases, which is what Franklin requires when instituting a burden of restraint. I see the right time. Which is a good question. I think that's a good question regarding your challenging the overriding long disclosure requirement here in the amended statute still. And I'm just curious. I'd like to understand your perspective about how frequently this review should occur and what's right now required of these three years or when the investigation is closed and your review is not enough. What freedom requires is that there be clearance of the government. So for as long as the, once it's been held for as long as it needs to be held, it can stay in place. And then the government should have to go back to court. That's not what the statute requires. But isn't it just as usual, here all you have to do is ask the government, it's going to go back to court. Well, so each time the recipient would like to, you know, to be reviewed in the state court. And then it is no way of knowing whether the need is, has, has for getting the government's opinion. It should be the government that has the burden of justifying the prior restraint as long as it is actually justified. So your,  so your scholarship is not an issue of the government. So, so this is caught in the nudge. Or is he that there's just too infrequent to be occurring? Both your Honor. And if you, if your argument is too infrequent, what, what do you think the time period should be? I think that the government, excuse me, themselves should have to gain the court's approval to do so in their freedom. And then the court, I think they should just impose a, a time period, a definite time period to justify restraint as justified. Because you know, it's not allowed, isn't it? Well, the district court could impose those time periods as they have done in several, in a couple of cases without doing it without anything further. I mean, there's a couple of cases where the district court addressed exactly the situation and said what needed to be done. Well, they may be able to. So in, in instance or however, the statute has to have that sort of guidance, for example, to the FBI, so that they don't issue these adjustment requirements. The, the guidelines issued by the FDIC. The statute allows for the court to make those adjustments. It's not, it says that the court may issue an order appropriate to the circumstances which is, is something of a tautology. Of course, of course, always have the authority to, to be on our order, their own orders. I think that what should be required is a guidance in the court that they, that they should be fixed during or as long as the, as it's actually justified. And in fact, it has to go to court in the first place, which it doesn't. I see my time is up. Is there a, is there a risk for a permanent getting here? Absolutely. Well, you're aware of most of the circumstance. So I think there are two, two permanent getting orders here. The first is when an MSL is issued, there's no court involvement. As I said, no court gets involved in this. And that's the worst that can happen on the interjects. Okay. So that's the second. The second is even under these review procedures instituted by the FBI, there are at most two reviews. And as the district of DC court found, there's some loopholes. And one of those loopholes is if the FBI ever closes an investigation, the gag order stays permanently. And in fact, if you close the investigation and at that point determines the gag order is still justified in the FBI's opinion, it stays permanently, which is what we have. That's what I find credo here. There's a permanent gag order that will not be reviewed by a court. That was my client. He challenged it, which is not a perspective of ours. The understanding was that the termination procedures that the government has instituted were not being challenged here. I know that you gave the ED a final debrief, but it wasn't part of your argument. As you know, in our reply briefs that you referred to, the termination procedures were issued after we filed our final brief in the district court. I don't think that the government has argued that we've conceded that we're going to challenge them as well. I see my time is up. I'm going to wrap up. Thank you. Thank you very much. Thank you. Thank you.  Thank you for your time. Thank you. Good afternoon, Your Honor. As your partner in justice, I'm here today on behalf of the government. I'd like to begin by explaining in the couple of arguments that Lu said for me why the 2015 amendments to the end of substance treatment have not exposed the requirement of both the scope and duration. And in doing so, I hope to provide Mr. Crawford's indication that a permanent gag is a risk, literally, of substance use. Before you do that, let me just ask the same question as the person counseled. Do you agree that there is still a non-disclosure requirement in place for at least one or two of these MSLs so that it's not rude before us now? We do agree with respect to the notice of the case. There is an MSL that implies a full force test for the drug there. And the most recent determination by the FBI as to whether or not the non-disclosure requirement did contain a requirement imposing certain obligations on pre-health and whatever. So it does continue to be an active controversy as to whether or not there is an MSL. Walking through the statute, I think it's quite critical in considering whether or not the statute is now available to consider the exact provisions. As you said, the statute now only gives non-disclosure orders both in scope and duration. I'd like to begin with the duration of the non-disclosure order. Section 502F of the U.S. Freedom Act required the Attorney General to adopt procedures terminating non-disclosure obligations when they were no longer needed. So now the combination of 18 U.S.C. 2709 and the procedures that the Attorney General adopted impose the following junctures at which the FBI must review whether or not non-disclosure is required. First, under 2709, the government, the FBI, must make a determination at the inception, at the sending of the MSL, whether or not disclosure is required to meet the statutoryly enumerated reasons. Second, under the 18 procedures, the three-year anniversary of the full investigation, the FBI must undertake another review to determine whether or not non-disclosure continues to be required. Third, at the termination of an investigation, the FBI must undertake yet another investigation of whether or not non- disclosure is required. And their presumption is for termination unless the facts require otherwise. Now, on top of those three junctures that I've just mentioned, under which the FBI must by its own undertake review, it is also the case that Congress amending the statute eliminated a restriction that prevented recipients from seeking review on a future basis or not a periodic basis. Now, under section 3511, a recipient at any time may ask the FBI to undertake review to determine whether or not the conditions for non-disclosure continue to exist. And if the FBI determines that non-disclosure is not required given the Only if it determines that non-disclosure continues to be required does the except of 3511 be drawn out. And it is the requirement that the FBI initiate a judicial review. So then, is it possible or not possible that a non-disclosure requirement could remain in place indefinitely? It is certainly possible, Your Honor. Correct. And so let's talk about that because I think that's probably one of the major concerns that might happen, others may have. If it remains indefinitely, does that violate the Freedman safeguards? No, Your Honor, because we believe that the Freedman safeguards require review as elaborated in the context of a case like this as the district court did below and as the Second Circuit did in the case before the most recent amendments. The Freedman requirements require judicial review when the circuit actually was listed to speak. The FBI issues tens of thousands of initials every year and it receives, relatively speaking, very few requests for disclosure. And there have historically been, relatively speaking, very few instances of suit by a court to challenge the non-disclosure requirements. That suggests, Your Honor, that I think so, Your Honor, that the not all recipients of NSLs wish to disclose NSLs. This is very much not like the regulation of bookstores or regulation of movies where, by the very nature of the institutions, the movie theater wants to display a movie, the bookseller wants to sell a book. Here, tens of thousands of NSLs are sent out every year. Most recipients do not wish to reveal them. And so, as elaborated in the context of this case, Freedman requires that a recipient send a notice which has to have two things, an identification of the NSL and a request under 33511 that the FBI either receive a non-disclosure order or invoke judicial review. That's a very simple notice. It can be a very short letter. It's simple, but it does put the initial burden on the plaintiff. Your Honor, I am most thankful to suggest that it is a de minimis burden. The burden that Freedman talked about was the burden of initiating judicial review. And, Your Honor, if I could initiate judicial review by sending a postcard, identifying two numbers. Well, it wouldn't be a postcard. It would have to be in Zimbabwe. But identifying two numbers, that is a de minimis burden. I'm just trying to figure out, you know, if it requires any effort on part of the recipients here, or is there purposeful under Freedman? Well, again, Your Honor, because it says, you know, the burden should be on the government. It doesn't drill down in Freedman. And I guess that's what we have to do here as to whether or not ultimately the government has the burden of showing why they should have this for whatever, you know, reasons of national security apply. But this initial, what you call, de minimis burden still, because it held us on the recipient. I'm just trying to figure out where in the case law that we have on this kind of prior restraining, is that required? So I think, Your Honor, that in any sort, I think that there is not a prior example in case law of this exact scenario. I think Freedman, in cases under Freedman, has typically been applied in cases where you have a true licensing scheme where a movie can't be displayed, where you know that the movie theater wants to display it, and where a book can't be sold, where you know that the bookseller wants to sell it. So I do think that the Court does have been asked in the context of a case where the evidence suggests that most of the people and most of the entities that receive CNSLs do not have this interest in public speaking. Whether it is saying that a CNSL doesn't take any action, they're currently restrained, are they not, from speaking? Yes, they are. But if they don't want to speak, then there is no infringement of any First Amendment right. The restriction is restriction only on an entity that wishes to speak. And if I may, before going to the scope limitations, I want to point out also that the Freedman, the burden that the Supreme Court was concerned about in Freedman was the burden of litigation, initiating and proceeding with litigation. A recipient can request litigation and may not even participate in litigation. It still remains the case under the statute that the government must file an application with a certification setting forth specific facts as to why the statutory standards are satisfied in the case before the court. The court must evaluate under the statute whether or not the government has shown that, in fact, there is a reasonable likelihood that harm will ensue and then make a determination. At the end, the recipient need not even show up. In fact, the government has litigated cases where a recipient has requested review. The FBI has determined nondisclosure continues to be required, and the recipient has not participated in the litigation. We suggest to you, Your Honor, that under Freedman, the burden is on the government under the statute and that that requirement is satisfied in the context of the case like this. And then I have one. And the recipient receives one of these letters. They offer, I mean, just the real world will have to consult with their lawyer. They have to consult among themselves and decide what they want to do. I don't know that it's as simple as picking up the phone and saying, hey, you know, we're going to initiate without having to undergo some of all kinds of evaluations on their part on whether or not to proceed. You see, some of them have chosen not to, and some of them have chosen to, you see, and then invoking, you know, the judicial review.  It's a different question whether or not an entity wishes to speak. I do think that there is consultation required, and I think the recipients in this case have very clearly expressed repeatedly that they have a very strong interest in speaking. And I think that, I mean, just as the movies are, it almost brings, and it's ante, the theater wants to distribute the movies to every recipient. So, no, whenever it wishes to speak, and it doesn't wish to speak at some time when it receives the NSL, for example, with the nondisclosure order, if three years later it decides it wishes that now to speak and reveal that it received an NSL, it can trigger FBI review apart from the review that's already required by the combination of the statute and the procedures. You see, if I invoke 3511, and there is no time limit, the statute eliminated the time limit that previously existed, the periodic limit on the ability of the recipients to seek judicial review. So, any time that a recipient does choose to speak or decides that it doesn't want to speak, it is able to get an NPOB review from the FBI, even from the courts. If I turn to the scope limitations, Your Honors, as I mentioned, under 3511, if there was, and invokes 3511, the FBI needs to make a determination that as to any piece of information that's subject to disclosure, disclosure, excuse me, subject to nondisclosure, that disclosure would be reasonably likely to lead to a statutory inquiry at harm. The FBI thus can distinguish between the fact of receipt of an NSL and the contents of an NSL. The statute authorizes it to do that. In addition, we know that, so does the FBI have to certify both that the disclosure of the fact that the NSL has been received and the disclosure of the contents of the NSL? Do they have to certify both? So, I guess the question is, when we're talking about in the process, if an entity receiving an NSL invokes section 3511, then it absolutely does because among the materials submitted in the government's application to the court within the 30-day period are a certification of identifying specific facts. The statute uses the term specific facts. It's 3511b2 to support the requirement of nondisclosure. And so it would be insufficient to identify specific facts that certain content would be reasonably likely to lead to a massive security harm. But I also think it would have the duty or the burden not only to show, I think it might be easier to show that the disclosure of the contents would result in one of the foreign-operated arms, but does the government have also the purpose to hold that the disclosure of the fact the NSL has been received meets one of the foreign-operated arms? Under 3511, yes, it does, Your Honor. And I should say that Your Honor's assertion may be mistaken. That is, there may be reasons why disclosure of the fact of receipt, if I could just use one example. This is kind of an easy example. I don't mean to suggest that it is the paradigm example, but I just want to illustrate for Your Honor, if you have a small provider and there's a limited number of clients, and the government is undertaking a national security investigation of either terrorism or espionage, if the receipt recipient of the NSL discloses that it received the NSL, the person associated with the information that the government sought might make a very reasonable inference that he or she is now being investigated or is somehow connected to the investigation. Now, again, I might underscore that I don't mean to represent that that is a typical example. It's just one that I'm trying to provide the Court as an illustration for why the fact of receipt in some circumstances can lead to a statutory harm. But as to Your Honor's question, absolutely when an individual or an entity in those 3511 is the government's burden as to any information that is subject to nondisclosure, to provide in the language of the statute specific facts justifying the need for nondisclosure. So here, in the NSLs before us, there were several instances where the government authorized disclosure of the fact of receipt but none of the target and other indexed information. I believe that there is only one NSL where there's something like the NSL for which the FBI made the most recent disclosures a few days before our argument. In that instance, the FBI informed the recipient that it could disclose the NSL with certain redactions as to content. So that would be an example where the recipient was free to disclose not only their receipt of the NSL but also some of the content of the NSL but not other portions of the content of the NSL. And we think that comes the closest to Your Honor's example. In addition, apart from the mandated review and the triggering of review under 3511, there are other mechanisms that Congress has put into the statute to enable recipients to speak in some manner under some circumstances. For example, under 2709C2E3, Congress authorized the FBI to permit disclosure to other persons as permitted by the corrector or his designee. What that shows, Your Honor, is that a recipient, even a science tree that I'm seeking a complete review, can go to the FBI and say, I have a specific purpose in mind and I'd like to disclose that receipt themselves. Under that provision, the FBI would have the authority. If the FBI said, no, you can't, then the recipient, if it's supposed to do so, could trigger a mandatory review under 3511 and obtain full judicial review of that determination. I'm sorry. I don't want to be trying to explain what you just said because I thought that this was a secret review at any time. Is that not true? The receipt is? Yes, it absolutely is. And I guess what I'm trying to do, the way I'm trying to distinguish, Your Honor, is a recipient who wants to seek full review of a nondisclosure order and a recipient who has a specific purpose in mind and wants to go to the FBI not to request full disclosure, but just to obtain the FBI's authorization to make a selective disclosure for a specific purpose. In one of my last comments, my implication with the provision that I mentioned or intended to show, is that the statute now is calibrated to allow the FBI to consider search requests and to authorize them if the FBI determines that it is permissible under its determination of the harm. And if not, then we would go to 3511 if the recipient chose to and could invoke a full mandatory review subject to judicial review if the FBI continues to require nondisclosure. So my understanding is that you get a new provision if a recipient comes to the government and says, I want to show this to a consultant and gets a negative response from the government, the claim to review that is through 3511. Yes, or is that correct? That is correct, Your Honor. I'd also like to address the point that the recipient speak in their brief and Mr. Corker alluded to in his presentation, that is, one recipient's, in this case, representative's inability to tell a congressional staffer that his company was subject to a nondisclosure. I think that is an extremely sympathetic and notable point. I would be incredibly frustrated if I were in that position as well. But I'm not sure that that point is relevant to the legal analysis that this Court must undertake for the following reason. Unless it's the case that there is no conceivable nondisclosure statute that would be consistent with First Amendment principles, it will always be the case that at some time a person subject to a nondisclosure order will not be able to speak because of the prohibition. And it may be an incredibly frustrating experience. But if there is a conceivable constitutional nondisclosure statute, it will be the case that some people are prevented from speaking. You know, I would say that the nondisclosure order that was at issue in that particular case has been lifted. And it is, of course, now the case that the recipient can go back to the congressional staffer and say, I'm sorry, you were mistaken. You know, it's absolutely true we can't wind back the clock, we can't go back to the time when the recipient wanted to speak for representation. But I would point out that there were other recipients of nondisclosure orders who were very vocal before Congress. Congress was amending the statute. You represented the interests of many entities that could not speak because they were subject to nondisclosure orders. Your time is gone.  Thank you, Your Honors. Thank you, Your Honor. I just want to add on this. He did never really respond to that. Heidi has done a first test for compressing press, but he did in his brief. So I just believe that as well. Thank you, Your Honors. I'd like to frankly make three points. Namely, the misreality contention that there's no evidence that NSO recipients want to speak in advance. I want to address this contention that the statute mandates the consideration of the facts perceived versus other contents in the NSOs. And I'd like to respond to what you just said about the anecdote about my client speaking to Congress. Beginning with the contention that NSO recipients don't wish to speak. It mentions a law that enabled police to conduct a stopping for instance, up at the street, and then tell that person up at the street, the person sitting at the church, you can't talk about this unless you go to court with a chip on your chin. That's not something that Freedman will allow. It's not something that the First Amendment will allow. But it is what the NSO signature allows for here. The burden is on the recipient in all of these issues that he's working. And the evidence is quite strong that my clients wish to speak. The transparency reports are a common practice in this industry. By means of the desires of people who are traveling. And it's the sort of arguments that the government is relying on are not inferred. What's the fix to that? The fix to that is the statute followed Freedman, Your Honor, that the government has to go to court to just decide on all of these occasions. I'm sorry, Your Honor. The government goes to the court first on all of these occasions. Yes, Your Honor. That's what the First Amendment and Freedman require is that the government wants to institute a requirement for you to go to court and justify that in every instance. There would be nothing short. There's no other alternative, Your Honor. The alternative is to use in Freedman. It also wishes that the damages all be settled after a specific brief period. So that the government has the choice of having that be a short period of non-disclosure or going to court and getting it to be justified for a longer period. That's the choice that Freedman sets out. If that's anything else, in an effort of effective finality to the censor's determination, initial determination, which is what we have here, the permanent back order, unless the recipient objects. Turning to Mr. Young's detention, the statute actually directs the NBI in a court to look at the different elements of an NSO and say, you can reveal the fact that you received one and have the contents. That's not in the statute. There's vague language about licensing other disclosures by the NBI in Section 279C2A3 and something smaller in the 3511, where a court can issue an order appropriate to the circumstances. There's nothing to guide the court's discretion in determining that. And without that, we see a sort of danger of licensing schemes that the Supreme Court has talked about in the Safe Language case and others. And whether or not the court applies the pressing press standard or the strict scrutiny standard, without that sort of consideration of narrower alternatives and revealing that they received a back order, a genomic contents of the NSO, for instance, the back orders are clearly over-inclusive or not narrowly excluded. So I consider those restrictive alternatives. It doesn't really matter which way the court looks at it. Perpetual power is incompatible with the First Amendment. Thank you very much. We'll go ahead and close the meeting. Thank you. Thank you. I'm going to be brief. You said you received a first decision. How did you receive that decision? How did you get the assay report? It seems like a big area.    Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Ikuta, N.R. Smith, Murguia